Filed 5/1/25  In re A.G. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | B337855 (Los Angeles County Super. Ct. No. 21CCJP05486) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JOSEPH M., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge.  Dismissed.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

_____

A.G. is Joseph M.'s (father's) teenage daughter. The juvenile court assumed dependency jurisdiction over A.G. because (1) father sexually abused another teenager in the home that father shared with A.G.; (2) father provided marijuana to A.G. and the other teenager; and (3) father possessed child pornography. The court removed A.G. from father's physical custody, placed A.G. in foster care, ordered the Los Angeles County Department of Children and Family Services (DCFS or the agency) to provide father with family reunification services, and permitted father to have monitored visits with A.G. This court dismissed father's appeal of the juvenile court's dispositional rulings.

At a six-month review hearing, the juvenile court found that father and paternal uncle had attempted to persuade A.G. to provide testimony favorable to father in the criminal proceeding arising from father's sexual abuse of the other teenager. Although the court ordered DCFS to continue providing reunification services to father, the court barred father and the paternal uncle from having contact with A.G. until father's criminal case was completed.[1] Father appeals from this no-contact order. He argues that visits may be suspended only if a parent jeopardizes the minor's physical safety and that, even if detriment to a minor's well-being were sufficient for a no-contact order, the juvenile court erred because its concerns could have been addressed by an order permitting a monitor to end a visit if father began discussing his criminal case with A.G.

_____

[1] Paternal uncle is not a party to this appeal.

During the pendency of this appeal, father pleaded nolo contendere to one count of lewd act upon a child and one count of possession of child pornography in the underlying criminal case, was sentenced to two years' imprisonment, and failed to appeal from an order terminating his reunification services. This court asked father for supplemental briefing as to why these events do not moot his appeal. Upon considering father's supplemental brief, we conclude that father's criminal case is now complete, and that we cannot reinstate father's reunification services to remedy any purported prejudice he may have suffered from the no-contact order because he failed to appeal from the order denying reunification services. We also reject father's argument that we should exercise our inherent discretion to reach the merits of this appeal. For all these reasons, we dismiss father's appeal as moot.

## BACKGROUND

We summarize only those facts relevant to our disposition of this appeal.

1. ***The original dependency petition, the juvenile court's order declaring father A.G.'s presumed father, the November 6, 2023 jurisdictional and dispositional rulings, and the dismissal of father's appeal from the November 6, 2023 rulings***

In June 2023, DCFS filed a petition pursuant to Welfare and Institutions Code[2] section 300 concerning A.G., a child who

---

[2] Undesignated statutory references are to the Welfare and Institutions Code.

was born in November 2007.  The juvenile court later designated father as A.G.'s presumed father.

The juvenile court held the adjudication and disposition hearing on November 6, 2023.  The court amended the operative dependency petition by interlineation, sustained the amended allegations against father, and assumed dependency jurisdiction over A.G. pursuant to section 300, subdivisions (b), (c), and (d).[3] As amended by the juvenile court, the petition alleged father (1) sexually abused an unrelated 15-year-old child in the residence father shared with A.G., (2) supplied the unrelated child and A.G. with marijuana, and (3) possessed child pornography.

Before it sustained the amended petition, the juvenile court admitted into evidence several DCFS reports, including the jurisdiction and disposition report.  According to that report, "A[.G.] reported that she was friends with the [unrelated 15-year-old] . . . .  A[.G.] reported that she was always present when [this friend of hers] was in the residence.  A[.G.] reported that she does not believe her father was inappropriate with [her friend] and reported that [the friend] was infatuated with her father . . . . [A.G.'s] reports appear to be in direct correlation with that of the father."  Per the report, A.G.'s caregiver told the agency that she overheard father (1) discuss the case with A.G. and (2) tell A.G. that " 'she needs to push her attorney or she is going to stay in [a] foster home forever . . . .' "

As for disposition, the juvenile court declared A.G. a dependent of the court, removed A.G. from mother's and father's

---

[3] Although the juvenile court did not sustain any jurisdictional counts against A.G.'s mother, mother submitted to the court's jurisdiction.

4

physical custody, placed A.G. in foster care, ordered DCFS to provide family reunification services to mother and father, authorized father to have monitored visits of at least one hour per week while in custody and a minimum of four hours per week upon his release from custody, and directed DCFS to "facilitate phone/video visits while father is in custody."[4]

Father appealed from the juvenile court's November 6, 2023 orders. This court later dismissed that appeal pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835.[5]

2. **Father's and paternal uncle's contact with A.G. during the six-month review period**

We derive this section's factual summary from the status review report DCFS prepared for the section 366.21, subdivision (e) six-month review hearing described in Background, part 3, *post*.

On December 27, 2023, A.G. reported father had telephoned her multiple times prior to that date; father often " 'berate[d] [her,]' " "75% of the time, the calls [we]re bad"; and "father was telling [A.G. that] people were whispering things in her ear trying to change her thought process and make her think different things about him." (Boldface omitted.) "A[.G.] stated

---

[4] Another document admitted at the November 6, 2023 hearing was the interim review report filed by DCFS on October 6, 2023, which stated that in August 2023, father had been arrested and charged with, inter alia, three counts of lewd act on a child aged 14 or 15.

[5] We, sua sponte, take judicial notice of this court's order dismissing father's appeal in case No. B333426. (Evid. Code, §§ 452, subd. (d), 459.)

she felt father was getting scared and that A[.G.] seemed to be too comfortable." (Boldface omitted.) A.G. said that although she did not want to live with father and "would be fine with not having phone calls from father," she "was still attached [to him] and wanted to see him . . . ." (Boldface omitted.) A.G. "stated she would like to see father in person, because she thinks that that would be different, because he would have to be able to say things face to face and people hide behind the phone." (Boldface omitted.)

A.G. stated that someone other than her caregiver was acting as a monitor for a call A.G. had with her father on December 26, 2023, and that during the call, father was "dismissive of anything she said." A.G. indicated father's behavior during the call caused A.G. to cry.[6] The social worker directed A.G. not to answer any calls unless her caregiver was available to act as a monitor, and when A.G. complained that father would "not stop calling" (boldface omitted), the social worker replied that A.G. "could put the number on block."

On January 9, 2024, A.G. reported to DCFS that "she had unblocked her father's telephone calls and he had not called her."

On January 16, 2024, A.G.'s caregiver told the agency that although A.G. had not received any calls from father, paternal uncle telephoned A.G. the day before and (1) "questioned why [A.G.] had not gone to father's hearing [in his criminal case] and [(2) asserted] that [the caregiver] had told [father's] investigator A[.G.] would not go"; the caregiver denied having any such

_____

[6] Similarly, in late November 2023, A.G.'s caregiver informed the agency that A.G. would "often put[ ] her head down and look[ ] at her feet and appear[ ] sad" while she was on the telephone with father. (Boldface omitted.)

6

conversation with the investigator. A.G. told the social worker she suspected father had told paternal uncle that she "did not want to go to court . . . ."

On January 18, 2024, paternal uncle told the agency he had asked why A.G. did not attend a hearing in father's criminal case because father's "attorney had told him that the [caregiver] had told them that A[.G.] said she did not want to testify." Notwithstanding the paternal uncle's initial claim that father's attorney had relayed that information to him, it appears that paternal uncle later admitted during his interview with the social worker that the paternal uncle was "just listening to what father had told him." The paternal uncle "stated until the case was solved he would stand behind father as he was claiming his innocence . . . ."

On January 28, 2024, a social worker took A.G. to visit father at Men's Central Jail. The social worker had difficulty monitoring the visit because it appears only one individual at a time (either A.G. or the social worker) could communicate with father using a telephone that "does not have intercom ability."

During the in-person visit, father told A.G. her caregiver had "lied about A[.G.] not wanting to testify for his criminal case." (Boldface omitted.) The social worker then got on the telephone, and father told the social worker that the caregiver "had ruined his due process and he should have been allowed to get out of jail and he could not because [the caregiver] had told his criminal attorney A[.G.] did not want to testify." Father also accused the caregiver of stealing certain belongings (including $3,500) from him. The social worker told father the caregiver would no longer monitor his calls with A.G. "as father seemed to be making negative comments." (Boldface omitted.)

A.G. got back on the telephone and "told father that he was lying and that he was spending all the time speaking to the [social worker] and not her." (Boldface omitted.) When father continued to claim the caregiver stole his money, A.G. "appeared to be upset" and insisted the caregiver had not stolen his money. (Boldface omitted.) After the visit, A.G. told the social worker "the visit had been good and bad," and A.G. "stated she was able to say things and he had to see her face so she liked that."

On March 18, 2024, the social worker telephoned a deputy at the Men's Central Jail and asked whether an in-person visit with an inmate could be held without the use of a telephone, and the deputy responded he did not believe it was possible for visitors to speak directly with the inmate. The deputy also "stated he was not sure of a way to do three-way calls as it had to be the inmate calling directly to a phone number." The deputy indicated that monitored videoconferencing with an inmate may be a viable option and transferred the social worker's call to another jail official who may have information; the social worker left a voice message with that other official requesting a call back. As of April 4, 2024, that second jail official had not returned the social worker's call.

DCFS stated in the status review report, "The current caregivers acting as monitors for father's calls is no longer an option as father is not able nor seemingly willing to be appropriate during his phone calls. In-person visits at the current facility are not able to accommodate the standards of a monitored visit." The agency "suggest[ed that] father and A[.G.] . . . exchange letters via the mail with [DCFS] acting as a buffer to monitor the content." DCFS opined, "[I]t would be beneficial for father and A[.G.] to be able to participate in

conjoint counseling upon father's release to help address the current parent/child dynamic."

### 3.   *The April 30, 2024 six-month review hearing and father's notice of appeal*

The juvenile court held the section 366.21, subdivision (e) six-month review hearing on April 30, 2024.  The court stated that it had reviewed and considered the six-month status review report filed on April 9, 2024 and two last minute information reports, one of which is the last minute information report that contains a page that was missing from the status review report.  At the hearing, father's counsel stated that although his client acknowledged "there have been some ongoing issues with visits, which [counsel thought were] laid out in the reports," counsel requested the court allow father to have visits with A.G.  A.G.'s counsel represented her client "want[ed] in-person visits with her father."

The juvenile court determined continued dependency jurisdiction was necessary and found clear and convincing evidence that returning A.G. to her parents would create a substantial risk of detriment to the child.  Although the court found father was not in compliance with his case plan, the court also concluded that DCFS had failed to provide reasonable reunification services to father.  The court ordered DCFS to continue providing reunification services to mother and father.

As for father's visitation, the juvenile court ordered that A.G. "have no contact with the father . . . until the father['s] criminal case is completed."  Similarly, the court barred paternal uncle from having contact with A.G. "until the father['s] criminal case is completed," and ruled that, "[o]nce the father['s] criminal case has completed, . . . [p]aternal [u]ncle is to have no

unmonitored contact until DCFS allows in writing." In our Discussion, *post*, we describe oral remarks made by the juvenile court at the hearing concerning these visitation orders.

On May 21, 2024, father filed a notice of appeal seeking review of the April 30, 2024 order barring A.G. from having "contact with father until his criminal case concludes."

4. ***Events occurring after the April 30, 2024 six-month review hearing[7]***

On August 20, 2024, the juvenile court held a 12-month review hearing pursuant to section 366.21, subdivision (f). The court found clear and convincing evidence that returning A.G. to her parents' physical custody would create a substantial risk of detriment to her. The court also determined that mother's progress toward alleviating or mitigating the causes necessitating placement had been substantial whereas father's was not, and that DCFS complied with the case plan by making reasonable efforts to return the child to a safe home. The court terminated father's reunification services, ordered DCFS to continue providing reunification services to mother, and scheduled a section 366.22 review hearing for mother. As of April 30, 2025, father has not appealed from the juvenile court's

---

[7] As explained below, with the exception of the minute order from the section 366.22 review hearing held on January 10, 2025, this court, sua sponte, took judicial notice of the orders discussed in this section in our letter to father requesting supplemental briefing. In his supplemental brief, father did not object to our decision to take judicial notice of these orders.

August 20, 2024 rulings and the 60-day deadline for doing so has elapsed.[8]

In September 2024, father pleaded nolo contendere to two criminal charges (i.e., one violation of Pen. Code, § 288, subd. (c)(1) and one violation of Pen. Code, § 311.11, subd. (a)), the trial court dismissed the remaining charges pursuant to a plea bargain, and father was sentenced to two years in state prison.  Father appealed the judgment on September 20, 2024 and, on October 17, 2024, the Court of Appeal limited his appeal to issues that do not require a certificate of probable cause.

On December 24, 2024, father's counsel filed the opening brief in the instant appeal.  In the opening brief, father's counsel does not mention the August 20, 2024 order terminating father's reunification services, father's failure to appeal that order, or father's plea of nolo contendere in his criminal case.

The juvenile court held the section 366.22 review hearing for mother on January 10, 2025.[9]  The court ruled "there is a compelling reason for determining that termination of parental rights would be detrimental to the child," and found by "clear and convincing evidence that [the] minor is not likely to be adopted and has no one willing as of the date of th[at] hearing . . . to

---

[8]  (Cal. Rules of Court, rule 8.406(a)(1) ["[A] notice of appeal must be filed within 60 days after the rendition of the judgment or the making of the order being appealed."].)  We, sua sponte, take judicial notice of the juvenile court's docket as of April 30, 2025.  (Evid. Code, §§ 452, subd. (d), 459.)

[9]  We, sua sponte, take judicial notice of the minute order from the section 366.22 review hearing held on January 10, 2025. (Evid. Code, §§ 452, subd. (d), 459.)

accept legal guardianship."[10]  "[I]n light of th[ose] facts," the court found "it is in the best interests of the child to order a permanent plan of planned permanent living arrangement in foster care with [the] goal of a permanent plan of return home, adoption, legal guardianship or placement with a fit and willing relative."  The court scheduled a hearing for June 16, 2025 to review A.G.'s permanent plan.

On March 19, 2025, DCFS informed this court that it takes no position on appeal and is not the proper respondent.  On March 28, 2025, the juvenile court submitted a letter stating that it "declines to take an adversary role in this proceeding."  Neither mother nor A.G. has filed a respondent's brief.

On April 7, 2025, this court requested supplemental briefing from father's counsel regarding whether the juvenile court's August 20, 2024 rulings, father's failure to appeal from those rulings, and father's plea of nolo contendere in his criminal case moot this appeal.  In the letter requesting supplemental briefing, this court took judicial notice of the juvenile court's August 20, 2024 minute order; the abstract of judgment, September 12, 2024 minute order, and September 18, 2024 minute order from father's criminal case; the Court of Appeal's October 17, 2024 order from father's appeal in the criminal case; and the juvenile court's docket as of April 7, 2025, which showed that father had not appealed from the juvenile court's August 20, 2024 rulings.

On April 15, 2025, father's counsel filed his supplemental brief, arguing (1) this appeal is not moot and (2) even if it is moot,

_____

[10]  The juvenile court noted that it had issued a protective custody warrant for A.G. on December 2, 2024 and that, as of January 10, 2025, A.G. "remain[ed] at large."  (Boldface omitted.)

we should exercise our discretion to resolve the merits of his appeal.

## LEGAL PRINCIPLES GOVERNING MOOTNESS IN DEPENDENCY CASES

"A court is tasked with the duty ' "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." ' [Citation.] A case becomes moot when events ' "render[ ] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief." ' [Citation.] For relief to be 'effective,' two requirements must be met. First, the plaintiff must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks." (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*).)

"In this context, relief is effective when it 'can have a practical, tangible impact on the parties' conduct or legal status.' [Citation.] . . . . [T]he plaintiff must . . . ha[ve] suffered from a change in legal status. . . . that is capable of being redressed by a favorable court decision." (See *D.P.*, *supra*, 14 Cal.5th at p. 277.)

"Even when a case is moot, courts may exercise their 'inherent discretion' to reach the merits of the dispute. [Citation.] As a rule, courts will generally exercise their discretion to review a moot case when 'the case presents an issue of broad public interest that is likely to recur,' 'when there may be a recurrence of the controversy between the parties,' or 'when a material question remains for the court's determination.' [Citations.]" (*D.P.*, *supra*, 14 Cal.5th at p. 282.) An appellate court may also "exercis[e its] discretion to decide an otherwise moot case [if it

13

presents] 'important issues that are capable of repetition yet . . . evad[e] review[.]' " (See *ibid.*) "Ultimately, in deciding whether to exercise its discretion, a court should be guided by the overarching goals of the dependency system: 'to provide maximum safety and protection for children' with a 'focus' on 'the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child.' [Citations.]" (*Id.* at p. 286.)

## DISCUSSION

At the April 30, 2024 six-month review hearing, the juvenile court stated: "A[.G.] is to have no contact with the father and the paternal uncle . . . until the father's criminal case is completed. [¶] . . . Until it's completed, there is incentive for them to continue efforts to witness tamper, be inappropriate, et cetera.[11] [¶] And so until that case is completed, they don't seem to understand the limitations of what they should and shouldn't be talking about and the detriment that that poses to A[.G.]" The court further remarked, "Of course, the father's disposition ordered visitation and contact would kick in once that limitation through his criminal case completion is finished."

On appeal from the April 30, 2024 no-contact order, father does not contest the juvenile court's finding that father and paternal uncle attempted to persuade A.G. to testify on father's behalf in the criminal case. Rather, father argues (1) the court's no-contact order was based on the wrong legal standard (i.e., the

---

**11** Earlier in the hearing, the juvenile court observed DCFS reported that the "paternal uncle [had been] inappropriate on the phone with A[.G.] and tr[ied] to pressure her regarding testifying in the father's criminal case."

14

court found that "visits were detrimental to A.G.'s *well-being*" but did not determine that "visitation would place the child's safety in jeopardy"), and (2) "the court's concerns that [f]ather discussed the criminal case with A.G. could have been resolved by an order that he not do so, perhaps with discretion for the monitor to end any visits in which he did." As we explain below, we conclude that father's conviction in the criminal case and his failure to appeal the August 20, 2024 order terminating his reunification services prevent us from providing father with effective relief in this appeal, and we decline to exercise our inherent discretion to reach the merits of father's moot appeal.

## A. Father's Plea of Nolo Contendere and His Failure To Appeal from the August 20, 2024 Order Terminating His Reunification Services Moot His Appeal from the No-Contact Order

Given that father's criminal case has been resolved by his plea of nolo contendere (see Background, part 4, *ante*), father no longer has any motive to persuade A.G. to provide testimony favorable to him during those proceedings. Also, to state the obvious, there are no witnesses at the appellate proceedings to influence. Although the juvenile court could have more clearly identified when father would no longer be barred from having contact with A.G., the court's remarks at the April 30, 2024 hearing demonstrate it would have deemed the criminal case to have been "complete" upon entry of judgment in his criminal case.[12] Therefore, even if we were to agree with father that "the

---

[12] (See *Concerned Citizens Coalition of Stockton v. City of Stockton* (2005) 128 Cal.App.4th 70, 77 [" 'The true measure of an

15

[juvenile] court's order was vague in its timeframe," we would not agree with his claim that the phrase "is completed" in the court's ruling could fairly be interpreted to refer to his "release from incarceration, the end of the appeal of any orders of criminal hearings, . . . [or] upon end of probation or parole." For that same reason, we reject father's assertion that "the criminal case cannot be considered 'complete' procedurally until all appellate remedies are exhausted."

Furthermore, at the section 366.22 review hearing held on January 10, 2025, the juvenile court found clear and convincing evidence that A.G. was not likely to be adopted and no one was willing to accept legal guardianship, and ordered that A.G. remain in foster care. (See Background, part 4, *ante*.) Given the court's rulings at the section 366.22 hearing, the court is required to "permit [father] . . . to visit the child unless it finds that visitation would be detrimental to the child." (See § 366.22, subd. (a)(3).) Therefore, moving forward in the dependency proceedings, the no-contact order does not prevent father from informing the juvenile court of the completion of his criminal case and requesting restoration of monitored visitation with A.G. Indeed, father acknowledges in his supplemental brief that if we "interpret the juvenile court's order . . . to allow for visitation upon [his] plea of nolo contendere[,] . . . then the issue may be rendered moot." He also acknowledges he may request visits

order, however, is not an isolated phrase appearing therein, but its effect when considered as a whole. [Citations.] . . . If the language of the order be in any degree uncertain, then reference may be had to the circumstances surrounding, and the court's intention in the making of the same.' "].)

16

with A.G. notwithstanding the juvenile court's order terminating his reunification services.

Father argues his appeal of the no-contact order is not moot because his inability to visit with A.G. could result "in the potential degradation of a meaningful relationship for reunification purposes." We acknowledge that denial of visitation may hinder a parent's prospects of reunifying with a dependent child. (See § 362.1, subd. (a) [indicating that the Legislature authorized visits during the reunification period "[i]n order to maintain ties between the parent . . . and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent"].) We further acknowledge that the juvenile court terminated father's reunification services on August 20, 2024. (Background, part 4, *ante*.)

Nevertheless, reversal of the April 30, 2024 order barring father from having contact with A.G. until his criminal case was completed would not invalidate the subsequent order terminating his reunification services because he did not appeal the latter ruling. (Background, part 4, *ante* [noting father did not appeal the Aug. 20, 2024 rulings]; see *In re Gael C.* (2023) 96 Cal.App.5th 220, 222–225 [holding that a parent's failure to appeal a juvenile court order " 'forfeit[s] any challenge' " thereto]; cf. *In re S.G.* (2021) 71 Cal.App.5th 654, 666–667 [recognizing that in a dependency case, the failure to appeal an order awarding custody and visitation and terminating dependency jurisdiction, which order was allegedly tainted by an earlier dispositional order regarding custody and visitation, may moot the parent's appeal of that prior dispositional order].) Therefore,

17

father has not shown we can redress any prejudice the no-contact order may have had on his ability to reunify with A.G.

Furthermore, we note father has not filed a section 388 petition seeking restoration of visitation and reunification services, and that he could have, but did not, appeal from the August 20, 2024 order terminating his reunification services after he pleaded nolo contendere in September 2024 but before the 60-day deadline for filing that appeal had elapsed.

The absence of an effective appellate remedy vis-à-vis reunification with A.G. renders unavailing father's reliance on *In re Dylan T.* (1998) 65 Cal.App.4th 765 (*Dylan T.*). There, the issue was whether, as part of a reunification plan, the juvenile court erred in denying a mother visitation while she was incarcerated for a drug possession offense merely because the minor was of a "tender age." (*Dylan T.*, at pp. 767–768.) The juvenile court, however, also ruled, inter alia, that if the mother were transferred to an inpatient drug program, mother would have monthly visitation. (*Id.* at p. 768.)

The appellate court held the juvenile court erred in denying visitation and the issue was not moot even assuming arguendo the mother had been subsequently released to a drug treatment facility. (See *Dylan T.*, *supra*, 65 Cal.App.4th at pp. 769–770 [accepting, "for the sake of argument," that the mother had been released from the jail and placed in a residential treatment program].) The *Dylan T.* court reasoned the mother's "relationship with [the child] was subject to erosion during th[e] time" in which the mother had been denied visitation; "although [the court assumed the mother] was released to a residential in-patient program," she could be "reincarcerated"; and "[b]ecause reunification efforts could be terminated after six months, the

18

lack of all opportunity for visitation during a significant portion of this time [was] an error which could infect the outcome of subsequent proceedings." (See *id.* at pp. 769–770.)

There is no indication in *Dylan T.* that the juvenile court terminated the mother's reunification services or that she failed to appeal from any such order. (See *Dylan T.*, *supra*, 65 Cal.App.4th at pp. 767–769 [discussing the factual and procedural background of the case and certain matters occurring after the no-visitation order was issued].) Therefore, *Dylan T.* had no occasion to determine whether effective appellate relief would be available under those circumstances. (See *In re H.E.* (2008) 169 Cal.App.4th 710, 721 [" 'Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered.' "].)

Father also argues, "Should the dependency case close, [the no-contact] order would prejudice him in family court which could address child custody issues. Even after A.G. reaches the age of majority in November 2025, there may be residual family law court issues in a divorce proceeding in which [f]ather could be prejudiced." Apart from these conclusory assertions, father does not elaborate on the prejudice he believes the April 30, 2024 order would cause him to suffer in family court proceedings. Nor is it apparent that reversal of the no-contact order at this juncture would have any impact on his rights in those proceedings.[13] Because "speculative future harm is [not]

---

[13] The jurisdiction and disposition report indicates that "mother reported she was in a long term relationship and ultimately marriage with father . . . ." Although a police report

19

sufficient to avoid mootness" (see *D.P.*, *supra*, 14 Cal.5th at p. 278), we reject father's argument that the juvenile court's alleged error "infects the outcome" of subsequent proceedings.

For these reasons, we are unable to provide father with effective relief in his appeal from the April 30, 2024 no-contact order.

## B. We Reject Father's Invitation To Exercise Our Inherent Discretion To Reach the Merits of His Moot Appeal from the No-Contact Order

Father argues we should exercise our inherent discretion to reach the merits of his appeal even if it is moot.

First, father cites *In re C.C.* (2009) 172 Cal.App.4th 1481 for the proposition we should reach the merits of his appeal to "avoid any possible collateral prejudice" to him. In *C.C.*, a mother appealed from a dispositional order that denied her visitation and conjoint therapy with her 12-year-old son. (See *id.* at p. 1483.) There, the juvenile court found dependency jurisdiction was proper based on the mother's inappropriate physical discipline and her emotional abuse of the child. (See *id.* at pp. 1483–1485.) The record contained evidence that the child refused to participate in monitored visits with the mother and that, on one occasion, the child left the visitation room, sat on the floor behind a couch, and banged his head against a wall while crying. (See *id.* at pp. 1484–1487.) On another occasion, the child "demanded [the mother] admit 'all the ways [she] hurt

attached to a DCFS interim review report filed on October 25, 2023 indicates mother and father were in the process of securing a divorce in August 2023, father does not clarify in his briefing whether those proceedings are pending.

20

[him]' and the names she had called him" and thereafter "rejected her attempts [to answer] and asked to leave the [visitation site] after 15 minutes." (See *id*. at p. 1486.) The juvenile court found further visitation with the mother would be detrimental to the child and suspended visitation pending a review hearing scheduled for approximately three months later. (See *id*. at p. 1487.) While the mother's appeal from the order suspending visits was pending, the juvenile court restored monthly monitored visitation for the mother through an "exit order" and terminated its jurisdiction. (See *id*. at pp. 1483, 1487.)[14]

On appeal, the reviewing court found the exit order and the order terminating jurisdiction "effectively moot[ed]" the mother's appeal. (See *C.C.*, *supra*, 172 Cal.App.4th at p. 1483.) The *C.C.* court rejected as "highly speculative" the mother's contention that "the finding of detriment upon which the challenged order denying visitation was based create[d] the possibility of prejudice in subsequent family law proceedings." (See *id*. at p. 1489.) Nevertheless, the Court of Appeal elected, "in an abundance of caution," to reach the merits to "eliminate even the remote possibility of prejudice to [the mother] arising from the adverse [detriment] finding [that was] based on [an] incorrect standard . . . ." (See *id*. at pp. 1483, 1489, 1492.) In particular,

---

[14] " 'When terminating its jurisdiction over a child who has been declared a dependent child of the court, section 362.4 authorizes the juvenile court to issue a custody and visitation order (commonly referred to as an "exit order") that will become part of the relevant family law file and remain in effect in the family law action "until modified or terminated by a subsequent order." ' [Citation.]" (*In re D.N.* (2020) 56 Cal.App.5th 741, 758, fn. 14.)

21

the *C.C.* court (1) construed section 362.1 as requiring that "some visitation [be ordered during the reunification period] unless the court specifically finds any visitation with the parent would pose a threat to the child's *safety*," and (2) held that the juvenile court erred in "premis[ing] its order suspending visitation on its finding by clear and convincing evidence that further visitation with [the mother] would be detrimental to [the child]." (See *C.C.*, at pp. 1490–1491.)[15]

As our summary of the facts of *C.C.* indicates, there was a possibility (albeit a remote one) the detriment finding in that case could have prejudiced the mother in future custody proceedings because the finding rested on evidence that the mother's abuse had caused the child to harbor ongoing emotional trauma and resentment that the child could experience in future visits with the mother. In contrast, here, the no-contact order was based on the juvenile court's finding—which father does not challenge on appeal—that father and paternal uncle sought to convince A.G. to testify on father's behalf in the criminal case. Now that judgment has been entered in the criminal matter, father has no occasion to replicate the behavior that the juvenile court found to be detrimental to A.G., which formed the basis of the no-contact order before us. Thus, whereas the *C.C.* court believed it was prudent to reach the merits of the mother's appeal to "avoid

_____

[15] We express no opinion on whether *C.C.* correctly interpreted section 362.1. (See also *In re Matthew C.* (2017) 9 Cal.App.5th 1090, 1101 ["There is currently a split of authority as to whether section 362.1 mandates visitation absent evidence of a threat to the minor's *physical* safety [citation] or whether courts may also deny visitation based on potential harm to the minor's *emotional* well-being."].)

any possible collateral prejudice" to her (see *C.C., supra,* 172 Cal.App.4th at p. 1483), this case does not present "even the remote possibility" of redressable harm potentially warranting appellate review (see *id.* at p. 1492).

Next, father argues this case presents "an important [question] that is capable of repetition yet evad[es] review because the [juvenile] court limited its order to the time period during which [f]ather's criminal case was co-occurring." Father claims, "[T]he court could make similarly erroneous orders regarding visitation but evade review by specifying an end date to the order which precedes the completion of appellate review." Father asserts that because "the no-contact order [is] vague, . . . the criminal case may *reopen* at some point and the juvenile court [may] renew the no-contact order."

We reject father's contention this case presents the type of issue that will evade review unless we hear the merits of this appeal. As we explained in Discussion, part A, *ante*, father could have preserved our authority to remedy any prejudice resulting from the no-contact order on his prospects of reunifying with A.G. by appealing from the August 20, 2024 order terminating his reunification services. Father's inability to secure appellate relief thus hinges on his failure to appeal from the order terminating those services, and not on the provision in the April 30, 2024 order barring father from visiting A.G. until his criminal case is completed.

Lastly, father maintains, "The appealed order is of important public interest because it not only affected [his] ability to retain a relationship with A.G. but also his ability to fully assert his Sixth Amendment right to a jury trial . . . ." Specifically, father argues, "The no-contact order *may* have

23

influenced [f]ather to hasten his criminal case by submitting to a plea of nolo contendere instead [of] asserting his right to a jury trial which would take more time, so he could reinstate contact with A.G." (Italics added.)

We reject as speculative father's assertion he *may* have decided to plead nolo contendere to felony sex offenses to complete his case expeditiously and resume contact with A.G. First, father's argument rests on a wholly unsupported factual premise. Specifically, father relies on the premise he could have prevailed at trial in the criminal case or, at the very least, could have obtained a more favorable sentence had he gone to trial, but nonetheless decided to forgo those potential advantages to reinstate contact with A.G. at a point in time before the trial would have been completed. Second, father's failure to file a section 388 petition seeking restoration of visitation after entry of his plea undercuts his assertion he gave up a jury trial just to reinstate contact with A.G. (See Discussion, part A, *ante*.) Accordingly, we find unpersuasive father's factually devoid argument that the no-contact order infringed on his Sixth Amendment right to a jury trial.

In sum, we conclude father's appeal from the April 30, 2024 no-contact order is moot, and we decline to exercise our discretion to entertain it. The proper remedy for this defect is dismissal of the appeal. (See *In re N.S.* (2016) 245 Cal.App.4th 53, 59–60.)

## DISPOSITION

We dismiss as moot father's appeal from the juvenile court's April 30, 2024 order barring him from having contact with A.G. until father's criminal case was completed.

NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

M. KIM, J.